Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: dsharp@girardsharp.com
Email: apolk@girardsharp.com

James E. Cecchi (*Pro Hac Vice Forthcoming*)
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com

*Counsel for Plaintiff and the putative Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

YAJAIRA DE LA ESPADA, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

SALESFORCE, INC. and TRANSUNION LLC,

Defendants.

Case No. 3:25-cv-9020

CLASS ACTION COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff Yajaira De La Espada ("Plaintiff"), individually and on behalf of the Nationwide Classes and Statewide Subclasses, as defined below ("Classes," and members of the Classes, including Plaintiff, are referred to as "Class Members"), allege the following against Defendants Salesforce, Inc. ("Salesforce") and TransUnion LLC ("TransUnion" and with Salesforce, "Defendants"), based upon personal knowledge, the investigation of counsel, and on information and belief as to all other matters:

## INTRODUCTION

1. In early June 2025, a major data breach occurred when hackers infiltrated Salesforce systems used by thousands of Salesforce customers – this breach was discovered by Google. The attack was carried out by an organized cybercrime group known as "The Com," linked to the infamous "ShinyHunters" collective ("Threat Actors").

2. The Threat Actors used social engineering and software manipulation to access Salesforce's systems. Once inside, the Threat Actors downloaded massive amounts of customer data and issued ransom demands on those customers. This initial attack spread further through an AI chatbot platform that integrates with Salesforce. By stealing digital access tokens, the Threat Actors were able to enter hundreds of Salesforce databases containing sensitive business information such as customer records, account details, and internal sales data. Salesloft, Inc., the owner of the affected chatbot platform called Drift, later confirmed that the attackers were primarily targeting passwords, cloud access keys, and other credentials that could be used to compromise additional systems (the "Salesforce Data Breaches"). This is an example of a 'hub-and-spoke' data breach.

3. By late August 2025, one of the affected companies in the Salesforce Data Breaches hired cybersecurity experts from Mandiant, Inc. to investigate, but by then the attackers had already expanded their campaign. Throughout September 2025, dozens of major companies – including TransUnion – reported that their Salesforce data had been compromised ("TransUnion Data Breach" together with the Salesforce Data Breaches, the "Data Breaches"). On October 3, 2025, the hackers launched a dark-web site claiming to possess more than one billion stolen Salesforce records. They threatened to release the data unless companies paid to "regain control" and prevent public exposure.

4. The stolen data for the Data Breaches included extremely sensitive personal information such as names, Social Security numbers, addresses, and birthdates ("Data"). Unlike passwords, these details cannot be changed, making them especially valuable to identity thieves and data brokers. Such personal information also holds measurable financial value in today's digital economy, as many technology companies rely on user data for advertising and analytics revenue.

5. Plaintiff and Class Members allege that Defendants failed to implement adequate safeguards to protect this sensitive information. Accordingly, Plaintiff and Class Members face a substantial risk of imminent and certainly impending harm, heightened here by the loss of their Social Security numbers – a class of PII which is particularly valuable to identity thieves. Plaintiff and Class Members have and will continue to suffer injuries associated with this risk, including, but not limited to, a loss of valuable time and opportunity costs and mitigation expenses over the misuse of their PII. Plaintiff seeks all available relief.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists, as Defendants

are citizens of states different from that of at least one Class Member. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

7. This Court has personal jurisdiction over Salesforce because it regularly conducts business in California, and its headquarters is in California.

8. This Court also has personal jurisdiction over TransUnion, as TransUnion's has both continuous and systematic contacts with California, and this lawsuit arises from TransUnion's contacts with California. TransUnion accepted the risk of litigation in California, where Salesforce is headquartered, when its executives approved the application and use of its software.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Saleforce's principal place of business is in California.

## DIVISIONAL ASSIGNMENT

10. Assignment to the San Francisco Division of this Court is proper because Salesforce's principal place of business is in San Francisco, California.

## PARTIES

11. Defendant Salesforce, Inc. is a privately held cloud-based software company with its headquarters and principal place of business at 415 Mission Street, San Francisco, San Francisco County, California 94105. Salesforce is incorporated under the laws of the State of Delaware.

12. Defendant TransUnion, LLC operates as an international information and insights company with its headquarters and principal place of business at 555 West Adams Street, Chicago, Cook County, Illinois. TransUnion is incorporated under the laws of the State of Delaware.

13. Plaintiff Yajaira De La Espada ("Plaintiff") is a resident of the State of Texas and received a notice of the TransUnion Data Breach on September 2, 2025 ("Notice"), that informed her that her PII was compromised in the TransUnion Data Breach, including her Social Security Number and Date of Birth. After the TransUnion Data Breach, Plaintiff received and continues to receive incredible amounts of spam calls, texts, and emails. As a result of the Data Breaches, Plaintiff De La Espada spent time and effort researching the Data Breaches and monitoring her accounts for fraudulent activity and subscribing to Experian for approximately $30 per month. Plaintiff De La Espada places significant value in the security of her PII. Plaintiff utilized and entrusted her sensitive PII to TransUnion with the understanding that TransUnion would keep her PII secure and employ reasonable and adequate security measures to ensure that it would not be compromised. Given the extremely sensitive nature of the information stolen,

and its subsequent dissemination to unauthorized parties, Plaintiff De La Espada has already suffered injury and remains at a substantial and imminent risk of future harm.

## FACTUAL BACKGROUND

### A. DEFENDANTS COLLECTED AND PROMISED TO PROTECT PLAINTIFF'S AND CLASS MEMBERS' DATA

14. Salesforce touts itself as "the #1 AI CRM, where humans with agents drive customer success together with AI, data, and Customer 360 apps on one platform."21 Salesforce's business model is made possible by the "Data Cloud, which brings together all your data into unified profiles, while keeping it secure."[1]

15. Salesforce's customers, including Transunion, store the PII of their customers and/or employees on Salesforce's platform using Salesforce's Data Loader among other offered services and software.[2]

16. Salesforce's marketing demonstrates that it is well aware that data security is a key component of the services it provides to its customers.[3] The following examples illustrate how Salesforce markets and highlights the strength of its data security practices to entice customers to use Salesforce's products and services as well as its awareness of industry guidance and regulations that set standards for effective data security practices:

17. Salesforce recognizes that "Security, privacy, and compliance are critical to every business. To provide customers with the most secure solutions possible, Salesforce builds security into everything we do."[4]

18. TransUnion is also well aware of the necessity of data security for its customers and employees. It highlights that it regularly deals in consumer "public and proprietary information," which it claims to "steward[] with care."[5] TransUnion's Data Security page claims that "[t]he security and protection of consumer information is the highest priority for TransUnion."[6] TransUnion further claims that "[d]ata security and stewardship is vital to consumer protection and enabling trust. At TransUnion,

---

[1] Salesforce, *What Does Salesforce Do?*, https://www.salesforce.com/blog/what-does-salesforce-do/#:~:text=Products-,Products,Partner%20Apps%20&%20Experts.

[2] *Id.*

[3] *Id.*

[4] Salesforce, *Shared Responsibility Model: How Salesforce Uses It*, https://www.salesforce.com/blog/shared-responsibility-model/.

[5] TransUnion, *About Us*, https://www.transunion.com/about-us.

[6] *Id.*

we continually invest in improvements to protect the data we hold on behalf of consumers and businesses."[7]

19. Yet despite these promises, Defendants failed to implement adequate cybersecurity protections.

## B. DEFENDANTS FAILED TO PROTECT PLAINTIFF'S AND CLASS MEMBERS' DATA

### 1. Defendants Had a Duty to Follow Regulatory Guidance and Industry-Standard Cybersecurity Practices

20. The Breach and exfiltration were a direct result of Defendants' failure to comply with state and federal laws and regulations, as well as basic industry standards governing the protection of Data.

#### i. Defendants must comply with FTC guidance regarding safeguarding the Data.

21. Defendants failed to comply with Federal Trade Commission ("FTC") guidance on protecting PII and complying with industry-standard cybersecurity practices. Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies, like TransUnion. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. To that end, the FTC recommends the following practices:

a. Limit access to customer information to only those employees who have a business reason to see it;

b. Keep customer information encrypted to provide better protection in case of theft;

c. Maintain up-to-date and appropriate programs and controls to prevent unauthorized access to customer information;

d. Use appropriate oversight and/or audit procedures to detect the improper disclosure or theft of customer information;

e. Monitor both in- and out-bound transfers of information for indications of compromise, such as large volumes of data being transmitted unexpectedly; and

f. Monitor activity logs for signs of unauthorized access to customer information.[8]

---

[7] *Id.*

[8] Fed. Trade Comm'n, *Financial Institutions and Customer Information: Complying with the Safeguards Rule* (Apr. 2006), https://www.lb7.uscourts.gov/documents/20-0046.pdf (last visited June 26, 2025).

22. The FTC has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[9]

23. In 2016, the FTC issued a publication, Protecting PII: A Guide for Business, which established guidelines for fundamental data security principles and practices for businesses.[10] The guidelines note that businesses should protect the personal customer information they keep; properly delete PII that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting to hack the system or accessing from an unknown location; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

24. The FTC recommends, among other things, that businesses restrict employee access to sensitive customer information; require that strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third-parties with access to sensitive information use reasonable security measures.

25. The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures that businesses must take to meet their data security obligations.

**ii. Defendants were obligated to meet or exceed industry standards regarding their network security.**

26. Defendants failed to comply with industry standards relating to data security, such as NIST, ISO 27001, and SOC 2.

---

[9] Fed. Trade Comm'n, *Start With Security* (June 2025), http://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited June 26, 2025).

[10] Fed. Trade Comm'n, *Protecting PII: A Guide for Business*, http://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited June 26, 2025).

27. NIST standards require that organizations implement access controls to limit the availability of sensitive customer information, "implement[] role-based access control and configuring it so that each user can access only the pieces of data necessary for the user's role" and "ensure that users who must access records containing PII only have access to the minimum amount of PII, along with only those privileges (*e.g.,* read, write, execute) that are necessary to perform their job duties."[11]

28. Like the NIST standard, the ISO 27001 standard focuses on establishing, implementing, maintaining, and continually improving an information security management system. Adopting ISO 27001 standards mitigates risk of unauthorized access and data breaches.[12] ISO standards recommend that companies undertake a risk assessment to determine if encryption must be used to protect the confidentiality of sensitive information and ensure that the data is accessible to those who need them when it is required.[13] ISO standards further address limiting access to sensitive data to only essential employees, implementing measures to ensure that access to data is allowed only after a verified authentication process, and implement a system to alert the organization to unauthorized access to data.[14]

29. Similarly, the SOC 2 standard is another widely recognized standard in the United States. SOC 2 compliance ensures that data is managed in a way that protects privacy and security, requiring regular audits and controls over data access.[15] SOC 2 compliance examines whether organizations encrypt data in motion or use, restrict "access to information assets, including hardware, data (including during processing and in transmission), software, administrative authorities, mobile devices, output, and offline system components," and "identify and authenticate individuals who can access sensitive data and

---

[11] Nat'l Inst. of Standards & Tech., *Guide to Protecting the Confidentiality of Personally Identifiable Information (PII): Recommendations of the National Institute of Standards and Technology* (Apr. 2010), https://nvlpubs.nist.gov/nistpubs/legacy/sp/nistspecialpublication800-122.pdf (last visited June 26, 2025).

[12] Int'l Org. for Standardization, *ISO/IEC 27001:2022 Information Security, Cybersecurity and Privacy Protection — Information Security Management Systems — Requirements* (2022), https://www.iso.org/standard/27001 (last visited June 26, 2025).

[13] Int'l Org. for Standardization, *ISO 27002:2022 – Control 8.24 – Use of Cryptography*, https://www.isms.online/iso-27002/control-8-24-use-of-cryptography/ (last visited June 26, 2025).

[14] Int'l Org. for Standardization, *ISO 27002:2022 – Control 8.3 – Information Access Restriction*, https://www.isms.online/iso-27002/control-8-3-information-access-restriction/ (last visited June 26, 2025).

[15] *AICPA & CIMA, 2018 SOC 2 Description Criteria (With Revised Implementation Guidance – 2022)* (Oct. 1, 2023), https://www.aicpa-cima.com/resources/download/get-description-criteria-for-your-organizations-soc-2-r-report (last visited June 26, 2025).

infrastructure, and segment networks and data bases and limit points of access to sensitive network segments."[16]

30. CISA guidance also encourages organizations to prevent unauthorized access by:

a. Conduct regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

b. Regularly patch and update software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

c. Ensure devices are properly configured and that security features are enabled;

d. Employ best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

e. Disable operating system network file sharing protocol known as Server Message Block ("SMB"), which is used by threat actors to travel through a network to spread malware or access sensitive data.[17]

CISA guidance further recommends use of the principle of least privilege ("POLP") should be applied to all systems so that users only have the access they need to perform their jobs.[18]

31. CISA guidance recommends that using a comprehensive network, in addition to network segregation, will help contain the impact of an intrusion and prevent or limit lateral movement on the part of malicious actors.[19]

32. Lastly, various cybersecurity industry best practices have also been published, are readily available, and should be consulted as a go-to source for an entity instituting, developing, maintaining, or enhancing its cybersecurity standards. Additional cybersecurity best practices include, but are not limited to, installing appropriate malware detection software, monitoring and limiting network posts, securing web browsers and e-mail systems, configuring network infrastructure (like firewalls, switches, and

---

[16] AICPA, *2017 Trust Services Criteria for Security, Availability, Processing Integrity, Confidentiality, and Privacy* (updated Mar. 2020), https://assets.ctfassets.net/rb9cdnjh59cm/72xv4p67HVXKp6CjWmjkPk/1cdbfa19f6307e2720396b66a6194dc9/trust-services-criteria-updated-copyright.pdf (last visited Aug. 11, 2025).

[17] Multi-State Info. Sharing & Analysis Ctr., Cybersecurity & Infrastructure Sec. Agency, U.S. DEP'T OF HOMELAND SEC., *Ransomware Guide*, at 4 (Sept. 2020), https://www.cisa.gov/sites/default/files/publications/CISA_MSISAC_Ransomware%20Guide_S508C_.pdf (last visited June 26, 2025).

[18] *Id.* at 6.

[19] *Id.*

routers), safeguarding physical security systems, training staff on key cybersecurity aspects, monitoring for vulnerability alerts, and promptly detecting and addressing vulnerability alerts before exploitation by cybercriminals.

33. As a result of failing to meet its obligations under the Contracts, Plaintiff and Class Members suffered actual harm.

**2. Defendants Failed to Implement Adequate Cloud Security Measures**

34. Any organization that utilizes cloud storage or services should be focused on cloud security. There are specific standards and guidelines readily available to assist any organization in managing cloud security, including:

a. ISO 27017, which provides guidance for cloud security and applies the guidance of ISO 27002 to the cloud with seven additional controls; and

b. ISO 27018, which is closely related to ISO 27017, and defines privacy requirements in a cloud environment, particularly how the customer and cloud provider must protect PII.

35. Given that threat actors frequently attack cloud repositories, improved network security can help mitigate attacks.

36. Defendants were aware of its obligations to protect its customers' Data before the Data Breaches yet failed to take reasonable steps to protect it from unauthorized access. Defendants were also aware of the significant repercussions if it failed to do so because they collected Data from millions of Americans and they knew that this Data, if hacked, would result in injury, including to Plaintiff and Class Members.

**3. TransUnion Failed to Implement Basic Security Controls to Protect the Data and Detect the Breach**

37. Due to the lack of MFA protection, TransUnion failed to prevent the theft of high-level administrative credentials, which should have required multiple security controls to use. As a result, the hackers were able to obtain compromised credentials for a contractor handling backend technical support and then steal data for millions of customers.

38. If TransUnion had required MFA to access sensitive information, the hackers would have been unable to use the compromised credentials to perpetrate the TransUnion Data Breach.

39. Plaintiff and Class Members utilized TransUnion's products and services on the reasonable expectation that TransUnion would comply with its obligations to keep such information confidential and secure. TransUnion failed to comply with these obligations.

40. TransUnion could have, and should have, taken steps that would have mitigated the risks from the typical and fundamental hacking tactics that resulted in this Breach.

41. The TransUnion Data Breach was accomplished by using stolen access credentials, which did not require MFA when accessing unencrypted data stored in an internet accessible location. Defendants could have prevented the Data Breaches by, *inter alia*, implementing spam filters to prevent phishing messages from reaching its employees, educating employees to detect and report phishing or other attempts to acquire access credentials, employing MFA to prevent stolen credentials from being misused to gain access to sensitive data, ensuring that Data was properly encrypted or redacted when accessed by contractors, limiting access to Data to only necessary employees, and monitoring the network for instances of unauthorized access or unusual activity, including access to and the transfer of large volumes of the data.

**C. PLAINTIFF AND CLASS MEMBERS ARE VICTIMS OF THE DATA BREACHES**

42. In early June 2025, Google's corporate Salesforce instance (used to store contact data for small- and medium-sized business clients) was compromised through a vishing-extortion campaign orchestrated by the threat-group tracked as UNC6040 & UNC6240 (online cybercrime collective known as "The Com" linked to "ShinyHunters" referred to as the "Threat Actors").[20]

43. The Threat Actors combined three core vectors:

44. Voice-phishing ("vishing") – Impersonating IT staff in a convincing phone call, persuading a Google employee to approve a malicious application connected to Salesforce, a rapid-reply extortion scheme demanding Bitcoin payments within 72 hours;

45. OAuth application abuse – the deployment of custom Python scripts that emulate Salesforce's DataLoader, allowing automated bulk exports;[21] and

46. Anonymity layers – Mullvad VPN-initiated calls followed by TOR-based data exfiltration, which anonymized the actors' true location.[22]

47. The detection of this attack marked the beginning of one the most significant cyber incidents in late 2025, which compromised the Salesloft Drift (AI chat-bot/assistant) used for its

---

[20] Seqrite, *Google Salesforce Breach: A Deep Dive into the Chain and Extent of the Compromise* (Sept. 2, 2025), https://www.seqrite.com/blog/google-salesforce-breach-unc6040-threat-research/.

[21] "Oauth" is an authorization framework that allows third-party applications to access user data on another service without requiring the user to share their password.

[22] *Id.*

Salesforce integration.[23] The theft of OAuth token resulted in running SOQL queries on Salesforce databases that held objects such as cases, accounts, users, and opportunities.[24] The attack affected hundreds of Salesforce customers, impacting not just Salesforce users but also other third-party integrations. Salesloft said "Initial findings have shown that the actor's primary objective was to steal credentials, specifically focusing on sensitive information like AWS access keys, passwords and Snowflake-related access tokens."[25] Google explicitly warned of the breach's extensive scope beyond its own systems.[26]

48. On August 28, 2025, Salesloft engaged Mandiant, a cybersecurity firm, to investigate the compromise of the Drift platform and its technology.[27] At that time, it was too late. The Threat Actor had already abused Salesloft Drift to launch a credential harvesting campaign in August, targeting hundreds of Salesforce instances using compromised OAuth tokens.[28]

49. Throughout September 2025, the Threat Actors hacked dozens of high-profile companies by breaking into their cloud-based databases hosted by Salesforce.

50. TransUnion confirmed that its data was stolen in a mass attack.[29]

51. On October 3, 2025, the Threat Actors launched a website pressuring companies to pay the hackers to avoid having their stolen data published online. Stating:

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Google Threat Intelligence Group, *Widespread Data Theft Targets Salesforce Instances via Salesloft Drift* (Aug. 27, 2025), https://cloud.google.com/blog/topics/threat-intelligence/data-theft-salesforce-instances-via-salesloft-drift

[28] *See* DataBreaches.net, *Salesloft+Drift Update on Investigation Results* (Sept. 7, 2025), https://databreaches.net/2025/09/07/salesloftdrift-update-on-investigation-results/ (The Mandiant investigation showed the Threat Actors gained access to the Salesloft GitHub account even earlier, between March and June 2025, where the hackers conducted reconnaissance activities in the Salesloft and Drift application environments. After gaining access, the Threat Actors downloaded content from multiple repositories and was able to establish workflows. "The threat actor then accessed Drift's AWS environment and obtained OAuth tokens for Drift customer's technology integrations," Salesloft said in the post.).

[29] *Id.* Insurance giant Allianz Life, Google, fashion conglomerate Kering, the airline Qantas, carmaking giant Stellantis, and the employee management platform Workday, among several others, have confirmed their data was stolen in these mass hacks. The hackers' leak site lists several alleged victims, including FedEx, Hulu (owned by Disney), and Toyota Motors.

a. Contact us to regain control on data governance and prevent public disclosure of your data; and

52. Do not be the next headline. All communications demand strict verification and will be handled with discretion.[30]

53. Below is a screenshot from the Threat Actors' leak site, which claims 1 billion records stolen from Salesforce databases:




54. At the top of the site, the Threat Actors mention Salesforce and demand that the company negotiate a ransom, threatening that otherwise "all your customers [sic] data will be leaked."[31]

## D. PLAINTIFF AND CLASS MEMBERS HAVE BEEN HARMED

### 1. Plaintiff's and Class Members' PII has Measurable Value

55. Plaintiff and Class Members entrusted Defendants with sensitive and valuable PII, including but not limited to full names, SSNs, addresses, birthdates, and other identifiable information. This data has an actual, measurable value in today's digital economy.

56. Defendants collect, store, and monetize user data as a regular part of their business model. In doing so, Defendants implicitly recognize that PII has substantial value. Major technology companies

[30] Lorenzo Franceschi-Bicchierai & Zack Whittaker, *Hacking Group Claims Theft of 1 Billion Records from Salesforce Customer Databases* (Oct. 3, 2025), TechCrunch, https://techcrunch.com/2025/10/03/hacking-group-claims-theft-of-1-billion-records-from-salesforce-customer-databases/

[31] *Id.*

routinely disclose the average revenue generated per user ("ARPU") in their financial filings, with leading platforms generating $15–$50 per user per month from advertising, profiling, and service optimization.

57. The compromised PII is of economic value because it cannot be easily changed. A compromised password can be reset. A stolen Social Security number or birthdate cannot be obtained. It is immutable. This permanence renders the information more useful—and therefore more valuable—to identity thieves and data brokers.

58. As a result of Defendants' failure to adequately safeguard Plaintiff's and Class Members' PII they seek compensatory damages for the measurable value of their compromised data, the cost of future protective measures, time spent remedying exposure, and non-economic damages arising from the violation of privacy rights.

### 2. Privacy Can Also Be Measured by the Cost Paid for It

59. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Prey, a company that develops device tracking and recovery software, stolen PII can be worth up to $2,000.00 depending on the type of information obtained.

60. Theft of PII can have profound consequences for the victim. The FTC warns consumers that identity thieves use PII, particularly social security numbers, to open new bank accounts, take out loans, start new utility accounts, and incur charges and credit in a person's name.

61. There are time lags between when PII is stolen, when it is used, and when a person discovers it has been used. On average, it takes about three months for consumers to discover that their identity has been stolen and used, but it takes some people up to three years to learn that information.

62. To protect themselves, Plaintiff and Class members will need to remain vigilant against unauthorized data use for years or even decades to come.

63. One such example of criminals using PII for profit is the development of "Fullz" packages, or dossiers on individuals. The development of Fullz packages means that stolen PII from the Data Breaches can easily be used to link and identify it to Plaintiff's and Class members' phone numbers, email addresses, and other unregulated sources and identifiers. Importantly, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cybercriminals in the Data Breaches, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class members.

64. According to the U.S. Federal Bureau of Investigation ("FBI"), in 2023, Internet-enabled crimes reached their highest number of complaints and dollar losses, resulting in more than $12.5 billion in losses to individuals and business victims.

65. In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend considerable time repairing the damage caused by theft of their PII and PHI.

66. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft. Victims of new account identity theft will have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank and credit accounts, open new ones, and dispute charges with creditors.

67. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated, "[m]ost consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."

68. An active and robust consumer marketplace for PII also exists. The global data brokering industry in 2024 is worth about $389.765 billion. . The data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.

69. As a result of the Data Breaches, Plaintiff's, and Class members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class members for their property, resulting in an economic loss. Moreover, their PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

70. The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (a) encrypting information stored on computer networks; (b) retaining payment card information only as long as necessary; (c) properly disposing of personal information that is no longer needed; (d) limiting administrative access to business systems; (e) using industry-tested and accepted methods for securing data; (f) monitoring activity on networks to uncover unapproved activity; (g) verifying that privacy and security features function properly; (h) testing for common vulnerabilities; and (i) updating and patching third-party software.

71. According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history, and reputation, and can take time, money, and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

72. To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive consumer data. *See In re Lookout Servs., Inc.*, 151 F.T.C. 532, 535 (June 15, 2011) (the defendant "allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as by employing an intrusion detection system and monitoring system logs"); *In re DSW, Inc.*, 2006 WL 6679055, at *2 (FTC Mar. 7, 2006) (the defendant "failed to employ sufficient measures to detect unauthorized access"); In re TJX Cos., Inc., 2008 WL 3150421, at *2, (FTC Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks"); *In re Dave & Buster's Inc.*, No. C-4291 (FTC May 20, 2010) (the defendant "failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between in-store networks"). These orders, which all preceded the Data Breaches, further clarify the measures businesses must take to meet their data security obligations.

73. Defendants failed to adequately protect Plaintiff's and Class members' PII and allowed criminals access to this sensitive data to use in the conduct of criminal activity. Specifically, Defendants failed to adequately protect Plaintiff's and Class members' PII from people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

74. Defendant's failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has failed to adequately protect the PII of Plaintiff and millions of Class Members from unscrupulous operators, con artists, and outright criminals.

## CLASS ALLEGATIONS

75. Plaintiff brings this class action individually on behalf of herself and on behalf of all similarly situated individuals in nationwide classes and, in the alternative, statewide subclasses, pursuant to Federal Rule of Civil Procedure 23. As described below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a), 23(b)(2), and 23(b)(3) (as well as the requirements for certification of one or more issue classes under Rule 23(c)(4)). Accordingly, Plaintiff seeks certification of the following Classes:

### NATIONWIDE CLASSES

76. Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), as applicable, Plaintiff seeks certification of the following nationwide classes:

**Salesforce Class.** All individuals residing in the United States whose PII was compromised in the Data Breaches.

**TransUnion Class.** All current and former TransUnion customers and employees residing in the United States whose data was accessed or stolen in the Transunion Data Breach.

77. The Nationwide Classes assert claims against TransUnion and Salesforce for Breach of Implied Contract (Count 1), Negligence (Count 2), Unjust Enrichment (Count 3), and Declaratory Judgment and Injunctive Relief (Count 4).

### STATEWIDE SUBCLASSES

78. In the alternative, Plaintiff repeats and reiterates the Nationwide Classes Definition and Claims on behalf of herself and subclasses ("Statewide Subclasses" and with the Nationwide Class, the "Classes") consisting of individuals in the State of Texas and brings an additional claim under the Texas Deceptive Trade Practices-Consumer Protection Act, Texas Bus. & Com. Code § 17.41, *et seq.* (Count 5).

79. Excluded from the Classes are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Classes are any judicial officers presiding over this matter, members of their immediate family, and members of their judicial staff having a financial or other beneficial interest in the outcome of this litigation.

80. **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Defendants have acknowledged that millions of individuals have been affected. The list of affected persons is available

from Defendants' records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

81. **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate any questions affecting individual Class Members. These common questions, among others, include:

a. Whether and to what extent Defendants had a duty to protect the confidentiality of the Data for their customers and former customers;

b. Whether Defendants failed to take reasonable and prudent security measures to ensure its systems were protected;

c. Whether Defendants failed to use available information to monitor their systems and prevent the Data Breaches from happening;

d. Whether TransUnion implemented MFA protection for its administrators and technical staff;

e. Whether Defendants knew or should have known that Defendants' computer and data storage systems were vulnerable to compromise;

f. Whether Defendants were negligent in failing to implement reasonable and adequate security procedures and practices;

g. Whether Defendants' security measures for TransUnion were reasonable considering applicable legal and regulatory requirements and industry standards including the FTC Act;

h. Whether Defendants had any contractual obligations to provide for the security of its customers' Data;

i. Whether Defendants complied with any contractual obligations to protect its customers' Data;

j. Whether Defendants' conduct resulted in or was the proximate cause of Plaintiff's and Class Members' injuries;

k. Whether Plaintiff and Class Members suffered damages or other losses because of Defendants' failure to protect their Data;

l. Whether Plaintiff and Class Members are entitled to declaratory and injunctive relief.

82. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly

unlawful conduct and harmed in the same way. Plaintiff's damages and injuries are akin to those of other Class Members, and Plaintiff seeks relief consistent with the relief of the Classes.

83. **Adequacy of Representation. Federal Rule of Civil Procedure 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Classes because Plaintiff is an impacted member of the Classes and is committed to pursuing this matter against Defendants to obtain relief for the Classes. Plaintiff has no conflicts of interest with the Classes. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in data breach and data privacy litigation. Plaintiff intends to vigorously prosecute this case and will adequately protect the Classes' interests.

84. **Predominance & Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate individual issues because the issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and Class Members may be relatively minor compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

85. **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members creates the risk of inconsistent adjudications and incompatible standards of conduct for Defendants.

86. **Ascertainability.** The Classes are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within each Classes. The Classes consist of individuals who had their information compromised in the Data Breaches, and class membership can be determined using Defendants' records.

87. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendants, through their uniform conduct, acted or refused to act on grounds applicable

to the Classes as a whole, making injunctive relief appropriate. Injunctive relief is also necessary to uniformly protect the Class Members' Data. Plaintiff seeks prospective injunctive relief as a separate remedy from any monetary relief.

88. Likewise, issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## NATIONWIDE CAUSES OF ACTION

### COUNT 1: BREACH OF IMPLIED CONTRACT
**(On behalf of the Classes against Defendants)**

89. Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 84 above and incorporates the same as if set forth herein.

90. Plaintiff brings this Count on behalf of the Classes under the laws of the State of California, or in the alternative, under the laws of the State of Texas.

91. Plaintiff and Class Members entered an implied contract with Defendants when they subscribed or used services from Defendants and provided their PII to Defendants.

92. By collecting PII from its customers, Defendants impliedly agreed to safeguard and protect the PII of Plaintiff and Class Members and to timely and accurately notify them if their PII was breached or compromised. Plaintiff and Class Members would not have used Defendants' products or Services in the absence of the implied contract or implied terms between them and Defendants. The safeguarding of the PII of Plaintiff and Class Members was critical to realize the intent of the parties.

93. Specifically, Defendants impliedly agreed and expressly stated in all applicable Privacy Policies that, in exchange for Plaintiff's and Class Members' provision of PII, Defendants would, among other obligations, maintain safeguards designed to protect the PII it collected, limit access to the PII to necessary personnel, and give timely and accurate notification if a breach occurs.

94. Plaintiff and Class Members fully performed their obligations under the express and/or implied agreements with Defendants by providing their PII and abiding by the Terms and Conditions.

95. Defendants materially breached its express and/or implied agreement with Plaintiff and Class Members by failing to protect their PII. Specifically, they (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) allowed Plaintiff's and Class Members' PII to be disclosed to unauthorized third parties; and (3) failed to provide adequate information regarding the Breach in order for Plaintiff and Class Members to undertake proper precautionary measures, in violation of the Agreements.

96. As a direct and proximate result of Defendants' breach of the express and/or implied agreements, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

**COUNT 2: NEGLIGENCE**
**(On behalf of the Classes against Defendants)**

97. Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 84 above and incorporates the same as if set forth herein.

98. Plaintiff brings this Count on behalf of the Classes under the laws of the State of California, or in the alternative, under the laws of the State of Texas.

99. Defendants required Plaintiff and Class Members to submit sensitive PII to use Defendants' products and services and collected and stored sensitive personal information about its customers on its own, either automatically as customers used Defendants' products and services, or through third-party data sources.

100. Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

101. Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in their possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendants' security systems to ensure that Plaintiff's and Class Members' PII in Defendants' possession was properly secured and protected; (b) maintaining security measures consistent with industry standards discussed herein; and (c) failing to delete customer PII that Defendants no longer reasonably needed to keep.

102. Defendants' duty to use reasonable care arose from several sources, including but not limited to the following:

103. Defendants hold themselves out as protectors of consumer data and thereby assume a duty to protect the data that was provided to it by Plaintiff and Class Members. Because of their role as one of the largest CRMs and credit bureaus, Defendants were in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members because of the Defendants' Data Breaches. Defendants' own privacy policies set forth some of the duties it assumed when obtaining customers' PII;

104. Defendants' duty also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect

PII by companies such as Defendants. In addition, individual jurisdictions have enacted statutes either based upon the FTC Act that also created a duty or that incorporate similar duties, as alleged below. *See, e.g.*, Cal Civ. Code § 1798.100; Cal. Civ. Code § 1798.80; and Tex. Bus. & Com. Code § 521.052;

105. Defendants violated Section 5 of the FTC Act and similar state consumer protection statutes by failing to use reasonable measures to protect PII and not comply with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Classes. Plaintiff and Class Members were within the class of persons the FTC Act and similar state consumer protection statutes were intended to protect and the type of harm that resulted from the Data Breaches was the type of harm that the statutes were intended to guard against. Thus, Defendants' violation of Section 5 of the FTC Act and similar statutes constitutes negligence;

a. Defendants had common law duties to prevent foreseeable harm to Plaintiff and Class Members. These duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. Not only was it foreseeable that Plaintiff and Class Members would be harmed by Defendants' failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes and had targeted Defendants' data systems prior to the Data Breaches; and

106. Defendants' duty to use reasonable security measures also arose because of the special relationship that existed between Defendants, on the one hand, and Plaintiff and Class Members, on the other hand. The special relationship arose because Plaintiff and Class Members entrusted Defendants with their PII as part of their use of Defendants' products and services. Defendants alone could have ensured that its security systems and data storage architecture were sufficient to prevent or minimize the Data Breaches.

107. Defendants were subject to these "independent duties," untethered to any contract between Defendants and Plaintiff and Class Members.

108. Defendants knew or should have known that its computing systems and data storage were vulnerable to unauthorized access and targeting hackers for the purpose of stealing and misusing confidential PII.

109. Defendants breached the duties they owed to Plaintiff and Class Members described above and thus were negligent. Defendants breached these duties by, among other things, failing to: (a) exercise

reasonable care and implement proper security systems, protocols and practices sufficient to protect the PII of Plaintiff and Class Members; (b) maintain security systems consistent with industry standards during the period of the Data Breaches; and (c) comply with federal regulations protecting the PII at issue during the period of the Data Breaches.

110. Plaintiff and Class Members were foreseeable victims of Defendants' inadequate data security practices, and it was also foreseeable that injury to Plaintiff and Class Members would result as described in this Complaint.

111. Plaintiff and Class Members had no ability to protect their PII that was in, and remains in, Defendants' possession.

112. Defendants could protect against the harm suffered by Plaintiff and Class Members in the Data Breaches.

113. Defendants' duty extended to protecting Plaintiff and Class Members from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts §302B (1965). Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

114. But for Defendants' wrongful breach of its duties, Plaintiff's, and Class Members' PII would not have been compromised.

115. Defendants' failure to take proper security measures to protect the sensitive PII of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional act, namely the unauthorized access of Plaintiff's and Class Members' PII.

116. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse of Plaintiff's and Class Members' PII, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breaches reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; the amount of the actuarial present value of ongoing high-quality identity

defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breaches; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

**COUNT 3: UNJUST ENRICHMENT**
**(On behalf of the Classes against Defendants)**

117. Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 84 above and incorporates the same as if set forth herein.

118. Plaintiff brings this Count on behalf of the Classes under the laws of the State of California, or in the alternative, under the laws of the State of Texas.

119. Plaintiff and Class Members entrusted their PII, which has inherent value, to Defendants to facilitate their receipt of services and direct benefits from Defendants.

120. Defendants understood and appreciated that the PII pertaining to Plaintiff and Class Members was private and confidential, and that its value depended upon Defendants maintaining the privacy and confidentiality of that PII.

121. Defendants never provided Plaintiff and Class Members for consideration of such use of their PII, and Plaintiff and Class Members provided no permission for such use.

122. Notwithstanding the additional monies earned by Defendants from the PII of Plaintiff and Class Members, Defendants did not take adequate measures or protections to prevent the kind of data breach that gives rise to this litigation.

123. It is inequitable, unfair, and unjust for Defendants to retain the profits it wrongfully obtained by its retention and use of the PII of Plaintiff and Class Members, and its retention of such profits violates fundamental principles of justice, equity, and good conscience.

124. Defendants are therefore liable to Plaintiff and Class Members for restitution or disgorgement of such unjustly accrued profits.

**COUNT 4: DECLARATORY JUDGMENT**
**(ON BEHALF OF THE CLASSES AGAINST DEFENDANTS)**
**UNDER 28 U.S.C. §§ 2201, *et seq.***

125. Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 84 above and incorporates the same as if set forth herein.

126. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.

The Court has broad authority to restrain acts, such as those here, that are tortious and violate in the terms of the federal and state statutes described in this Complaint.

127. An actual controversy has arisen in the wake of the Defendants' Data Breaches regarding its present and prospective common law and other duties to safeguard its customers' PII and Defendants' failure to maintain data security measures that effectively protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff continues to suffer injury because of the compromise of her PII and remains at imminent risk that further compromises of her PII will occur in the future given the nature and quantity of the PII stored by Defendants.

128. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

129. Defendants continue to owe a legal duty to secure consumers' PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes;

130. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure consumers' PII; and

a. As a result of Defendants' ongoing breach of this legal duty, Plaintiff and Class Members remain subject to continuing and imminent risk of harm.

131. The Court also should issue corresponding prospective injunctive relief requiring Defendants to employ proper security protocols consistent with law and industry standards to protect consumers' PII.

132. If an injunction is not issued, Plaintiff will suffer irreparable injury and lack an adequate legal remedy in the event of additional data breaches of Defendants' systems. The risk of another such breach is real, immediate, and substantial. If another breach of Defendants' systems occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and she will be forced to bring multiple lawsuits to rectify the same conduct.

133. The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs, Plaintiff will be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is minimal, and Defendants have a pre-existing legal obligation to employ such measures.

134. Issuance of the requested injunction will not disserve public interest. On the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the additional

injuries that would result in Plaintiff and the millions of consumers whose PII would be further compromised.

**CAUSE OF ACTION FOR THE STATEWIDE SUBCLASSES**

**COUNT 5: DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION**
**(On behalf of the Statewide Subclasses against Defendants)**
**Texas Bus. & Com. Code § 17.41, *et seq.***

135. Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 84 above and incorporates the same as if set forth herein.

136. Defendants are "persons," as defined by Tex. Bus. & Com. Code § 17.45(3).

137. Plaintiff and the Statewide Subclasses Members are "consumers," as defined by Tex. Bus. & Com. Code § 17.45(4).

138. Defendants advertised, offered, or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

139. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") declares unlawful "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46(a).

140. A violation of the Texas Identity Theft Enforcement and Protection Act is a deceptive trade practice under the Texas DTPA. Tex. Bus. & Com. Code § 521.001, *et seq.*

141. During their business, Defendants engaged the following deceptive trade practices:

142. Failing to implement and maintain reasonable procedures, including taking appropriate corrective action, to protect Plaintiff's and Subclasses Members' PII, as required by the Texas Identity Theft Enforcement and Protection Act, Tex. Bus. & Comm. Code § 521.052(a), which was a direct and producing cause of the Data Breaches; and

143. Failing to identify and remediate foreseeable security and privacy risks and sufficiently improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and producing cause of the Data Breaches.

144. Defendants acted intentionally, knowingly, and maliciously to violate Texas' Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Plaintiff's and the Statewide Subclasses Members' rights.

145. As a direct and proximate result of Defendants' deceptive acts or practices, Plaintiff and Statewide Subclasses Members have suffered and will continue to suffer injury, ascertainable losses of

money or property, non-monetary damages, as described herein. Defendants' deceptive acts or practices were a producing cause of Plaintiff's and Statewide Subclasses Members' injuries, ascertainable losses, economic damages, and non-economic damages, including their mental anguish.

146. Defendants' violations present a continuing risk to Plaintiff and Statewide Subclasses Members as well as to the public.

147. On October 20, 2025, counsel for Plaintiff provided written notice to counsel for Defendants via electronic mail of their intent to pursue claims under the Texas DTPA and an opportunity for Defendants to cure. The written notice sets forth the violations of Defendants' duty to implement and maintain reasonable security procedures and practices alleged in this Complaint. The written notice, sent in Plaintiff's representative capacity, complied with Tex. Bus. & Com. Code, Section § 17.505's written notice requirement.

148. To date, Defendants have taken no action to remedy its misconduct or otherwise address the violations outlined in the written notice sent by Plaintiff's counsel.

149. Plaintiff and Statewide Subclasses Members seek all monetary and non-monetary relief allowed by law, including economic damages; damages for mental anguish; treble damages for each act committed intentionally or knowingly; court costs; reasonably and necessary attorneys' fees; injunctive relief; and any other relief which the court deems proper.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all Class Members of the proposed Nationwide Classes and/or Statewide Subclasses, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A. That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. That the Court grant permanent injunctive relief to protect the extremely sensitive information of Plaintiff and Class Members;

C. That the Court award Plaintiff and Class Members compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

D. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants because of their unlawful acts, omissions, and practices;

E. That the Court award statutory damages, treble, and punitive or exemplary damages, to the extent permitted by law;

F. That Plaintiff and the Classes be granted the declaratory relief sought herein;

G. That the Court award Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H. That the Court award pre- and post-judgment interest at the maximum legal rate; and

I. That the Court grants all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all claims.

Dated: October 20, 2025

Respectfully submitted,

*/s/ Dena C. Sharp*

Dena C. Sharp (State Bar No. 245869)
Adam E. Polk (State Bar No. 273000)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: dsharp@girardsharp.com
Email: apolk@girardsharp.com

James E. Cecchi*
Kevin G. Cooper*
Jordan M. Steele (State Bar No. 362684)
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com
Email: kcooper@carellabyrne.com
Email: jsteele@carellabyrne.com

Jason H. Alperstein*
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
2222 Ponce De Leon Blvd.
Miami, Florida 33134
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jalperstein@carellabyrne.com

*Counsel for Plaintiff and the putative Class*
* *Pro hac vice application forthcoming*